# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

ATL, INC., a Washington corporation,

    Plaintiff,

v.

CITY OF SEATTLE,

    Defendant.

Case No. C09-1240RSL

MEMORANDUM OF DECISION

This matter comes before the Court following a three-day bench trial. Plaintiff ATL, Inc., filed suit under 42 U.S.C. § 1983, alleging that the City of Seattle (the "City") violated its constitutional rights when it failed to timely issue an "adult entertainment premise license" and subsequently failed to accept its application for a building permit. It seeks "lost profit" damages in excess of $1.6 million, as well as attorney's fees pursuant to 42 U.S.C. § 1988.

The Court previously found that the City violated Plaintiff's First Amendment rights when it failed to accept its completed permit application on February 9, 2012. Dkt. # 98. It also found that the City's "adult entertainment premises license" requirement was facially invalid because, at the time, it "fail[ed] to place limits on the time within which the decisionmaker must issue the license." Dkt. # 97 (quoting FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 227 (1990) (plurality opinion)). As a result, the trial primarily concerned whether Plaintiff could prove damages.

After hearing the testimony and reviewing all of the evidence, the Court finds

MEMORANDUM OF DECISION - 1

that Plaintiff has failed to prove that the City's actions caused it any economic loss. Furthermore, the Court finds that there is a substantial question as to whether Plaintiff has standing to challenge the validity of the City's licensing ordinance. Accordingly, the Court awards Plaintiff $1 in nominal damages for the City's delay in accepting its permit application and directs the parties to file supplemental briefing on the issue of standing and Plaintiff's entitlement to attorney's fees.

## FINDINGS OF FACT

Between 1988 and 2005, the City enforced a moratorium on the issuance of building permits for adult cabarets. That moratorium was struck down on September 12, 2005. ASF, Inc. v. City of Seattle, 408 F. Supp. 2d 1102 (W.D. Wash. 2005). As a result, the City began regulating adult entertainment businesses through licensing and dispersion requirements. As is relevant to Plaintiff's attempts to obtain licenses and permits, the licensing ordinance, SMC 6.270.090, stated:

> A. After an investigation, the Director shall issue the applicable license or licenses authorized by this chapter if the Director finds:
>
> 1. That the business for which a license is required herein will be conducted in a building, structure and location which complies with the requirements and meets the standards of the applicable health, zoning, building, fire and safety laws of the State, the ordinances of the City, as well as the requirement of this chapter;
>
> 2. That the applicant, his or her employee, agent, partner, director, officer, stockholder or manager has not knowingly made any false, misleading or fraudulent statement of material fact in the application for a license, or in any report or record required to be filed with the Director;
>
> 3. That the applicant, and all employees, agents, partners, directors, officers, or managers of the applicant have attained the age of eighteen (18) years.

The applicable dispersion ordinance, SMC 23.47A.004.H, stated:

MEMORANDUM OF DECISION - 2

H. Adult Cabarets.

    1. Any lot line of property containing any proposed new or expanding adult cabaret must be 800 feet or more from any lot line of property on which any of the following uses has been established by permit or otherwise recognized as a legally established use: community center; child care center; school, elementary or secondary; or public parks and open space use.

    2. Any lot line of property containing any proposed new or expanding adult cabaret must be 600 feet or more from any lot line of property for which a permit has been issued for any other adult cabaret.

    3. The dispersion analysis required by subsections 23.47A.004.H.1 and 2 shall be based on the facts that exist on the earlier of:

        a) the date a complete application for a building permit for an adult cabaret for the property proposed to contain the new or expanding adult cabaret is made, or

        b) the date of publication of notice of the Director's decision on the Master Use Permit application to establish or expand an adult cabaret use, if the decision can be appealed to the Hearing Examiner, or the date of the Director's decision if no Hearing Examiner appeal is available.

Plaintiff is a Washington corporation incorporated on October 6, 2008. Def. Exh. # 528. It has only one officer and shareholder: Robert Davis. Id. Davis is also the lone officer of ASF, Inc.—the entity that successfully challenged the adult cabaret moratorium. Previously, Davis had owned and operated "Giggles," a comedy club, in Seattle. He and ASF eventually converted Giggles into "Jiggles," an unpermitted adult cabaret closed by the City in February 2010—three months after it opened.

As is relevant to this case, Davis's attempts to open an adult cabaret began in 2008. The plan was to purchase Cindy's Pancake House ("Cindy's") at 10507 Aurora Ave. N. and convert it into a cabaret owned and operated by ASF. See Pl. Exh. # 1. Apparently, Davis thought his plan was a good one. While still negotiating to purchase Cindy's, ASF submitted an application for an adult entertainment premises license for

MEMORANDUM OF DECISION - 3

that location on February 8, 2008.  Id.  He says that, at the time, the City told him it would make a determination within 30 days.  Def. Exh. # 548.

On February 28, 2008, Davis received a letter from the City.  It informed him that it could not issue ASF a license until after he had obtained all of the necessary zoning and building permits.  Def. Exh. # 547.  Davis responded on April 8.  He complained that the City was trying to bury him in red tape so that it could avoid issuing him a license.  Def. Exh. # 548.  He also asked if the Cindy's location was even a viable location for an adult cabaret.  Id.

Within a week, Andrew McKim, a City land use supervisor, wrote back.  Def. Exh. # 549.  He reiterated to Davis that ASF could not receive an adult entertainment premises license for the Cindy's location until it had submitted applications for the appropriate use and building permits and had received the necessary approvals.  Id. McKim also told Davis that, based on a "limited search," he believed that the Cindy's location would satisfy the City's dispersion requirement.  Id.  He explicitly conditioned that statement, though, stating that he had not conducted an exhaustive search and could not guarantee that a more exhaustive search would not turn up an inconsistent use.  Id. He told Davis that the City placed the onus on applicants to research "the uses in the neighborhood to ensure that the dispersion standards are met."  Id.

On June 25, 2008, Davis filed a second license application for Cindy's on ASF's behalf.  Once again, the City wrote to tell him that he would have to show compliance with zoning, building, fire, safety, and health laws before the license could issue.  On August 12, Davis's attorney wrote to the City, stating her belief that the City had violated ASF's rights by not issuing the requested license.  See Pl. Exh. # 2.  Robert Tobin, an assistant attorney for the City, responded shortly thereafter.  Id.  He noted that the City would issue ASF an adult entertainment premises license for the Cindy's location but that ASF would still be required to obtain the necessary use and building

MEMORANDUM OF DECISION - 4

permits before it could begin operating as a cabaret.[1]  Id.  ASF was issued a license shortly thereafter.

Around that time, Davis entered into the first of several contracts to purchase Cindy's, agreeing on behalf of ASF to purchase the property for $1.850 million.[2] However, as the property market fell, so did ASF's interest.  On October 2, 2008, the purchase agreement was rescinded.  It was replaced in early December by a purchase agreement for $1.325 million between the seller and Plaintiff.  That agreement terminated in early January.

On December 31, 2008, Davis again contacted the City.  He went in person to city hall to inquire about obtaining a permit to add a stage to Cindy's.  Unaware that Plaintiff intended to open an adult cabaret, and not a restaurant, the intake clerk told him that he would need a remodel permit but that "no change of use permit" would be required.  See Pl. Exh. # 5.  This misunderstanding did not last long, however.  Before Plaintiff applied for a permit, the "neighborhood" informed the City of Plaintiff's intent to open an adult cabaret and identified two incompatible uses in the surrounding area:  a church 742 feet east of Cindy's that had a permit to operate a day care center and an adult bookstore 342 feet away with a permit to operate an adult cabaret.  These prior

---

[1] Tobin relied on the "concurring opinions in City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774 (2004)" for the authority to require permitting.  The Court points out that the authority for that proposition appears directly in the majority opinion, which described zoning requirements as content-neutral.  Littleton, 541 U.S. at 783 ("Nor should zoning requirements suppress that material, for a constitutional zoning system seeks to determine where, not whether, protected adult material can be sold. (emphasis in original) (citing City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46 (1986))).  It was also the direct holding of the Court in Renton, which upheld a 1,000-foot dispersion requirement in reliance on Seattle's experience with the collateral effects of adult cabarets.  475 U.S. at 54–55; accord Dkt. # 98. Finally, unlike the ordinance at issue in FW/PBS, the City's permit-zoning ordinance has a 120-day decision deadline.  It thus avoids the fate of Dallas's ordinance.  493 U.S. at 226–27.

[2] Unless otherwise mentioned, each of the purchase contracts contained a "feasibility" provision that voided the agreement unless Davis notified the seller within a set time frame that he was satisfied of "the availability of government permits and approvals" or "the feasability of the Property for Buyer's intended purpose."

MEMORANDUM OF DECISION - 5

uses had been permitted in 1971 and 1989 respectively.[3]

As a result, the City instructed its intake personnel on January 21, 2009, that, "if the project is an adult cabaret, project must meet dispersion criteria . . . [and] should not be accepted at intake without documentation regarding dispersion, or a written statement on the plans documented [sic] that this permit will not include approval of an adult cabaret." Pl. Exh. # 5. Two days later, Davis attempted to submit an application on Plaintiff's behalf. Id. Because that application did not include the necessary dispersion demonstration, the City refused to accept it. Id.; see also Def. Exh. # 552. Davis returned again on February 9, 2009. Pl. Exh. # 5. This time, his application was complete; it included a dispersion analysis showing both the church and the book store and represented that the "restaurant meets the zoning code dispersion requirements."[4] Noting that Plaintiff's own plan demonstrated two incompatible uses, the City again refused to accept his application. Pl. Exh. # 5.

For the next few months, Plaintiff did nothing other than continue to negotiate over the purchase price of Cindy's. By July, the price had dropped to $1.1 million, prompting Plaintiff to enter into another purchase agreement on July 10. This time, there was no "feasability" clause.

Only then did Davis turn once more to his attorney. On July 16, she wrote the City to inform them of her belief that, having obtained an adult entertainment premises license, Plaintiff did not need to obtain a "master use" permit to operate Cindy's as an

---

[3] The Court recognizes that neither of these non-compatible uses were still "in use" in early 2009. Ultimately, that fact was immaterial, however, given that, as McKim explained at trial that, the permits were non-lapsing and thus the owners of the respective buildings retained the right to renew those uses at any time. In fact, Plaintiff does not dispute that the book store later reopened its "Dancing Bare" cabaret.

[4] This application was also the first to reflect that Plaintiff intended to use the property as an adult cabaret.

MEMORANDUM OF DECISION - 6

adult cabaret.[5]  She also argued that, even if it did, the identified non-compatible uses were not actually non-compatible because they were no longer in use.[6]  Finally, and most importantly for present purposes, she argued that the City could not simply refuse to accept Plaintiff's application.  Under controlling law, the City had to accept Plaintiff's completed application and make a determination from which Plaintiff could at least appeal.  Six days later, the City responded.  Pl. Exh. # 4.  It informed Plaintiff that while it disagreed with many of the positions expressed in its attorney's letter, it would accept and review Plaintiff's application.[7]

On August 18, Plaintiff resubmitted its permit plans.  Fourteen days later, the City denied its request.  In a letter dated September 1, 2009, the City explained that Cindy's did not satisfy the dispersion requirements of SMC 23.47A.004.H due to the location's vicinity to the church and the adult book store and each's permits.  Plaintiff filed suit in federal court that same day.  Dkt. # 1.

## CONCLUSIONS OF LAW

As explained, the Court has already ruled that the City violated Plaintiff's constitutional rights when it refused to accept its completed permit application on February 9, 2009.  Dkt. # 98.  It also found that the City's licensing requirement, SMC 6.270.090, was facially invalid because it did not contain a non-discretionary deadline for making a determination once a license was submitted.  Dkt. # 97.  The Court thus

---

[5] To be clear, Plaintiff had not obtained a license of any kind; ASF had.  And Plaintiff has not presented any evidence to suggest that it attained the benefit of that license.  The Court discusses the ramifications of this fact infra.

[6] The Court addressed this argument at Dkt. # 98.

[7] Plaintiff's attorney responded the next day, stating, "It is unfortunate that you disagree with me; I suppose a federal judge will have to tell you that what the City . . . is doing is unconstitutional." Pl. Exh. # 7.  She also gave the City a six-day deadline to give Plaintiff the requested remodel permit.  Id.

MEMORANDUM OF DECISION - 7

turns straight to Plaintiff's request for damages.[8]

**A. Lost Profits**

The Ninth Circuit has recognized "that lost profits are 'necessarily an estimate.'"[9] <u>Humetrix, Inc., v. Gemplus S.C.A.</u>, 268 F.3d 910, 919 (9th Cir. 2001) (citation omitted); <u>accord</u> <u>Silver Sage Partners, Ltd. v. City of Desert Hot Springs</u>, 251 F.3d 814, 820 n.6 (9th Cir. 2001) ("[W]hile a plaintiff seeking to recover lost profits must ordinarily prove the fact of injury with reasonable certainty, proof of the amount of damages may be based on a reasonable estimate." (citation omitted)). Thus, "[w]hile the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." <u>Silver Sage</u>, 251 F.3d at 820 n.6 (quoting <u>Story Parchment Co. v. Paterson Parchment Paper Co.</u>, 282 U.S. 555, 563 (1931))

In this case, Plaintiff's theory is relatively straightforward. It argues that it was injured by the City's failure to grant it a license on February 12, 2008, and timely grant it a permit on February 9, 2009, and that, absent these delays, it could have been open for business at a different location by May 1, 2008. Relying on the average income of the four Seattle-area cabarets owned and operated by Deja Vu, a national chain, it argues that it would have expected to earn net profits of $1,667,908 during the 16-month delay period it attributes to the City. It also seeks an additional $636,733 in pre-judgment interest. The Court finds no basis for such an award.

Under no circumstance would Plaintiff have opened a club by May 2008. Rather,

---

[8] The Court recognizes that damages are more akin to findings of fact than conclusions of law. It discusses them in its conclusions of law section simply for the benefit of context.

[9] "The Court is unpersuaded by [the parties'] argument [that Washington law applies] since it does not take into account the fact that since the only claim wherein [Plaintiff] seeks monetary damages is its § 1983 claim, the issue of damages is governed by federal law, not [state] law." <u>The Yadin Co. v. City of Peoria</u>, No. CV-06-1317-PHX-PGR, 2007 WL 552221, at *2 (D. Ariz. Feb. 21, 2007).

MEMORANDUM OF DECISION - 8

the evidence makes clear that Plaintiff delayed in filing its permit application until February 9, 2009, because it was taking advantage of a free-falling real estate market—making more money by not acting than it could have otherwise. And, even after filing its application, Plaintiff continued to tread cautiously. Thus, even if the City had moved as fast as Plaintiff now demands, the Court finds that Plaintiff has failed to prove, as a matter of fact, any damages. Given the pace at which Plaintiff moved throughout this process, the volatility of the market, and Davis's own statements, the Court finds it more likely than not that Plaintiff would have done nothing while Davis waited to convert Giggles into Jiggles. Moreover, even were the Court to assume that Plaintiff would have acted promptly to open at an alternate location, the evidence demonstrates that it would have only lost money.

**1. Pre-Permit Application Delay**

There are many problems with Plaintiff's theory. First, Plaintiff did not apply for a license on February 12, 2008; ASF did. ATL did not even come into existence until October 3, 2008—nearly eight months later. And, as discussed, Plaintiff has not provided any evidence that it is entitled to the benefit of ASF's license. In fact, the only proven thing the two entities appear to share is Davis—the lone officer and shareholder of each. Def. Exh. # 528; <u>see also</u> Dkt. # 98 at 6. This finding alone wholly negates Plaintiff's ability to claim damages prior to the City's unlawful refusal to accept its permit application on February 9, 2009.

Moreover, even assuming that Plaintiff would be entitled to rely on ASF's license, the record flatly contradicts Davis's self-serving, post hoc testimony that he would have acted immediately to obtain a permit. When ASF obtained its license in late August 2008, Davis did not rush to city hall to apply for a permit. He did not even call the City. And, frankly, there was no reason he would have. It was his position all along that, despite the City's warning to the contrary, Pl. Exh. # 2, the City could not preclude

MEMORANDUM OF DECISION - 9

him from opening Cindy's as a cabaret after he had a license.[10] Instead, Davis kept watching and waiting as the property market continued to free fall. He rescinded ASF's $1.85 million agreement to purchase Cindy's in October 2008[11] and then did nothing while the market continued to collapse, taking Cindy's asking price down with it.

Three months later, Davis was still watching. In early December, he finally made a move, agreeing for the first time to purchase Cindy's <u>on Plaintiff's behalf</u>. The price was $1.325 million—more than half a million dollars less than in August. Only then did Davis contact the City, inquiring about a remodel permit. He continued to move slowly, though, waiting almost another month before submitting his remodel plans on January 23, 2009. Pl. Exh. # 5. When those plans were rejected as incomplete, Plaintiff waited an additional 17 days before resubmitting them on February 9.

Given these undisputed facts, there is no question in the Court's mind that Davis, through his actions on Plaintiff's behalf, is solely responsible for any pre-February 9 delay. His actions are by no means illogical: the delay would have saved Plaintiff half a million dollars at the outset. However, that delay dooms Plaintiff's attempt to claim lost profits during that period, and the Court need only determine when the Plaintiff might have been damaged by the City's delay in accepting his permit application.

**2. Post-Permit Application Delay**

The Court must first determine what period of unlawful delay to attribute to the City. Only then can it determine whether Plaintiff has carried his burden of demonstrating damages.

    **i. The Delay Attributable to the City**

As discussed in the Court's prior Order, Dkt. # 98, the City must make a

---

[10] He tested this theory with Jiggles, a cabaret ASF opened without the appropriate permits. The City shut Jiggles down three months later after obtaining a court order.

[11] ATL rescinded its purchase agreement one day before Plaintiff was incorporated.

MEMORANDUM OF DECISION - 10

dispersion determination within 120 days of a permit application being filed.[12] Contrary to the City's position, however, this does not allow it to simply count back 120 days from February 9 and categorically disregard all of the intermittent time. See Littleton, 541 U.S. at 781 ("Freedman's 'judicial review' safeguard is meant to prevent 'undue delay,' includ[ing] judicial, as well as administrative, delay." (emphasis in original) (citation omitted)).[13] While 120 days may serve as the presumptive starting point, and adult business are not entitled to special or expedited treatment, the City is not entitled to the benefit of "undue delay." Id. at 784. And, the evidence in this case makes clear that any delay beyond March 15, 2009, would have been "undue."

For one, when the City eventually accepted Plaintiff's application in July, it made a determination in 14 days. The City was also able to make a decision on the 2011 application of "Pandora's Adult Cabaret" in only 45 days.[14] Moreover, as McKim explained at trial, the City does little to actually ensure that a property is deserving of a requested use permit. The City does a perfunctory check, but otherwise relies almost exclusively on the representations of the applicant, and the lack of any neighborhood complaints, to determine whether there are non-compatible uses in the surrounding area. As a result, permits are ordinarily denied only when the City receives a complaint and that complaining party has taken the trouble to identify specific non-compatible uses for the City. McKim further explained that cases in which a complaint is received are the

---

[12] As a result, SMC 23.47A.004.H avoids the facial validity problem that dooms SMC 6.270.090—the "fail[ure] to place limits on the time within which the decisionmaker must" make a decision. Compare Dkt. # 97 (quoting FW/PBS, 493 U.S. at 227), with Littleton, 541 U.S. at 781–84.

[13] To be clear, the Court is not stating that the City must drop everything and address an application like Plaintiff's. The Supreme Court rejected that contention in Littleton. See 541 U.S. at 781–84. Neither will the Court scrutinize the City's process as a matter of course. Id. "[A]n adult business is [simply] not entitled to an unusually speedy . . . decision." Id. at 784; cf. id. at 781 (likening judicial decisions to administrative ones).

[14] The City did not receive any timely citizen complaints in this case.

MEMORANDUM OF DECISION - 11

easiest for the City to resolve.

Each of these facts counts heavily against the City's attempt to rely on the full 120-day period it had to make a decision. In reality, given the circumstances of this case and the City's concessions regarding its meager process, the Court thinks the appropriate question is whether the City can rely on a delay of more than 14 days. There is no dispute that, in this case, the City already had received a complaint about Plaintiff's plans for Cindy's by the time Davis tried to submit his first application. There is also no dispute that the complaint identified each of the non-compatible uses relied upon by the City. Accordingly, it does not appear that the City had anything more to do than it did in July. Still, the Court recognizes that "undue delay" requires something more than the ordinary, inherent delays of bureaucracy. And, unlike in July, Plaintiff's attorney was not in contact with the City, threatening lawsuits, and the City's attorneys were not "expediting" review of Plaintiff's application. See Pl. Exh. # 6. For these reasons, the Court finds that, had Plaintiff's application been accepted as it should have on February 9, the City would have processed the application and denied Plaintiff's request for a permit by March 15. The remaining delay is thus attributable to the City.

### ii. Damages Resulting from City's Delay

Having identified March 15, 2012, as the beginning of the delay period, the Court must determine what profits, if any, Plaintiff lost as a result. Given that Plaintiff took no action after being informed that Cindy's was not a viable option, the Court is left only to consider what might have been—a question that edges right up to the line of "mere speculation." Cf. Cal. Diesel & Equip., Inc. v. Sun Exploration & Prod. Co., 917 F.2d 1307, at *4 (9th Cir. 1990) (memorandum decision) ("Whether, and to what extent, Cal Diesel would have earned a profit on the vacant lot was anyone's guess; given the uncertainties in the real estate market, and Cal Diesel's unfamiliarity with the automotive servicing business, we conclude that it was not unreasonable for the court to

MEMORANDUM OF DECISION - 12

find Cal Diesel's claim of lost profits unduly speculative.").[15] Ultimately, the Court thinks that two scenarios are reasonably possible. See Silver Sage, 251 F.3d at 820 n.6. Neither benefits Plaintiff.

The first possibility is that Plaintiff would have continued to do nothing as the property market continued to deteriorate. Certainly, Plaintiff's contract to purchase Cindy's for $1.325 million had terminated pursuant to its own terms in early January, and Plaintiff did not enter into another contract until late June and did not pursue a permit again until getting an even more favorable deal in July.

Even more damning is Davis's own testimony. When the Court asked him why Plaintiff had not pursued an alternate location after having its third permit application denied on September 1, he explained that he knew by then that he would be getting Giggles back and "did not want to have two projects going at once." He added that he would have moved to an alternate location in May 2008 but, by September 2009, he was tired of dealing with the City. Considering that he also testified that the hardest part about starting a club is finding a location and getting the necessary permits, the Court finds it more likely than not that Plaintiff would not have acted any different in March 2009 than it did in September. In other words, it would have done nothing. See Cal. Diesel, 917 F.2d at *4 ("As the Shell Chemical court stated, a trial court does not abuse its discretion where evidence of lost profits 'rests on unsupported assumptions and unsound extrapolation.'" (quoting McGlinchy v. Shell Chem. Co., 845 F.2d 802, 807 (9th Cir. 1988))).

Nevertheless, even assuming the Court would agree that Plaintiff would have broken with the past and acted promptly to secure an alternate location, it still fails to prove any damages. Even if the City had officially informed Plaintiff on March 15 that

---

[15] The Court recognizes that a memorandum decision is not binding and cites this case only as a succinct encapsulation of this Court's rationale.

MEMORANDUM OF DECISION - 13

Cindy's was not a viable location, it would not have been possible for Plaintiff to begin operating right away even under the best of circumstances. Plaintiff would have needed time to find a suitable property, time to obtain the necessary permits and licenses, time to remodel that property, and time to hire a staff. The Court finds that these necessary perquisites would have taken, at best, at least an additional four months.

In regard to the first point, time to find an alternate location, Davis testified at trial that Plaintiff was "ready to go" on a vacant property at 5th and Lenora in downtown Seattle, and that he had already obtained a license for that property. The Court does not find that account credible. Plaintiff presented the Court with no evidence of a second license or any applications for a permit. More importantly, the Court questions why Plaintiff would continue to press for Cindy's if an alternate, available location existed. Plaintiff has repeatedly represented to this Court that Seattle has few locations appropriate for an adult cabaret, yet Davis would have this Court believe that he found a suitable site in the heart of downtown and did nothing. That, despite the incredible profits Plaintiff claims it could have made had it been able to open "somewhere within the city limits of Seattle," Pl. Exh. # 33, it sat on its hands. Davis's self-serving, unsupported testimony is not credible. Instead, the Court finds that, at best, it would have taken two weeks to find an alternate location and four weeks to close a deal.

In regard to the second point, the Court thinks it would have taken at least two months to secure the necessary city approvals. As already detailed, the Court found that the City could have made a determination on Cindy's permits within a month. However, that determination was largely influenced by the fact that neighbors had already identified two non-compatible uses for the City—a fact that, as McKim explained, expedites the review process. In contrast, the Pandora's application took 45 days to process because no one complained of any non-compatible uses prior to or during the City's review. The Court thus uses this 45-day delay as a reasonable

MEMORANDUM OF DECISION - 14

yardstick because, again, it assumes the best case scenario for Plaintiff—that there would not have been any non-compatible uses in the relevant vicinity of its chosen location.

In addition, the Court must add 15 days to the time required to get a permit to account for the time necessary to have an architect draw the required remodel plans. The Court finds 15 days to be a reasonable estimate in this case as it is the same amount of time that elapsed between Davis's last permitting meeting with the City in January 2009 and his first attempt to file an application. Pl. Exh. # 5. Adding the two permitting delay periods together results in a net permitting delay of two months. Still, in this best-case scenario, the Court will assume that Plaintiff would have begun the permitting process immediately upon finding an alternate location. Accordingly, the net delay would have been only one additional month, bringing the total delay to two-and-a-half months.

Next, the Court must consider the time required to remodel an alternate location. The Court thinks the most reasonable estimate for this delay can be evidenced from the time it took Davis to remodel Giggles: six weeks. In both cases, Davis explained that he intended to make only minimal changes, and the Court, for purposes of this assumed best-case scenario, will not account for the fact that Giggles was already setup as a club, with a stage and kitchen, and thus required less extensive remodeling than another site might. Still, because Plaintiff would not have been able to begin remodeling until he secured the necessary permits from the City, this time must be tacked on to the end of the permitting period, resulting in a total delay of four months.

Finally, the Court accounts for the time necessary to hire a staff. To be generous, the Court will not add any additional time for staffing. As a result, the Court finds that, under the very best of assumed circumstances, Plaintiff could have opened its doors on July 15, 2009—resulting in a damages period of one-and-a-half months.

MEMORANDUM OF DECISION - 15

The Court must then tabulate the net profits lost in that 45-day period. As far as profits go, Plaintiff and Defendant paint vastly different pictures as to what Plaintiff could have expected to earn. Defendant points to the actual earnings of Davis's other cabaret, Jiggles, which grossed $14,420 in its first partial month of operation and $31,570 in its second. Def. Exh. # 529 at 6; Pl. Exh. # 33 at 4. It argues that Davis himself testified that Plaintiff intended to use the same business model as Jiggles, apart from his concession that expenses would rise to, as he saw it, roughly $47,633 because he expected that the alternate club would have been open during the day as well.[16] See Pl. Exh. # 33, Schedule 6.

In contrast, Plaintiff argues that Jiggles should be ignored and this Court should find that Plaintiff could have expected monthly profits of $136,178 in 2009, Pl. Exh. # 33, Schedule 2, coupled with those monthly expenses of $47,633. It relies on the average monthly profits of the three Deja Vu cabarets in Seattle to justify its revenue figure, though, ironically, it disregards the much higher operating costs of each in favor of Davis's estimated expense tally. The Court sees no basis for using the Deja Vu figures and not the Jiggles figures. Deja Vu is a national corporation that is well established in the Seattle area. Their locations are all well-appointed and heavily advertised, and are generally located in more prime locations. Moreover, their top revenue generators are far larger than the club Plaintiff anticipated opening and have established clienteles. In short, comparing Plaintiff's hopes with Deja Vu's reality is to

---

[16] Notably, these expense figures were derived solely from Davis's undocumented representations of what he anticipated paying, and include, for example, a monthly rent estimate of only $5,000 even though Davis testified that Cindy's mortgage would have cost more than $13,000 each month. This disparity raises real questions about the reliability of Davis account. Frankly, it makes little business sense that Plaintiff would have continued pressing for the Cindy's location when, according to Davis's own figures, it would have been easy to secure an alternate, yet no more profitable, location for less than half the cost.

MEMORANDUM OF DECISION - 16

compare apples and oranges.[17]

As a result, the Court finds that Jiggles's experience serves as the only reasonable estimate of what Plaintiff might have expected to earn during its first few months. In making that finding, the Court recognizes that Jiggles garnered a great deal of negative publicity when it opened in December 2010 without permits. The Court is simply not persuaded that the negatives associated with that publicity were not outweighed by the benefits of free daily publicity. As demonstrated by the complaints surrounding Jiggles, Pandora's, and the planned club at Cindy's, negative reception seems to be just one of the expected costs associated with a cabaret's opening.

In any case, relying on Jiggles's figures as a reasonable estimate of revenue, it is clear that, even under the best of circumstances, Plaintiff would not have made any money. Even assuming the club earned $33,000 per month, Davis himself estimated monthly expenses of $47,633. As a result, it would have lost nearly $15,000 each month. And, even assuming that its extended daytime hours brought in some additional income, Plaintiff has not presented any evidence of the profitability of an adult cabaret during the day. The fact that Davis elected not to open Jiggles during the day suggests to this Court that those daytime hours are not very profitable.

In sum, Plaintiff has failed to prove any economic loss.

**B. Nominal Damages**

Though the Court finds that Plaintiff failed to prove that it suffered any economic loss as a result of the City's action, it does not excuse the fact that the City did violate Plaintiff's rights when it refused to accept its February 9 permit application. For the reasons previously expressed, Dkt. # 98, the Court thus awards Plaintiff nominal

---

[17] The Court finds little persuasive merit in Plaintiff's damages report given that it did not consider the size of the locations, the profile of the clubs, the amount of dancers, the amount of advertising, or anything about the locations apart from the fact that each was located on two-way streets, had adequate parking, and would be open from 11 a.m. to 2:30 a.m. each day—the only three factors that distinguished Jiggles.

MEMORANDUM OF DECISION - 17

damages of $1 for this violation. Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 308 n.11 (1986) ("[N]ominal damages . . . are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury . . . .").

Whether nominal damages are appropriate for Plaintiff's success in challenging the facial validity of SMC 6.270.090, Dkt. # 97, is a closer question. At the time the Court ruled on the matter, it was laboring under the assumption that Plaintiff had assumed ASF's interest in the adult entertainment premises license applied for and ultimately issued to ASF. See Mot. (Dkt. # 17) at ¶ 2.8 ("issue a . . . license to ATL"); id. at ¶ 2.10 (same); id. at ¶ 2.12 ("ATL paid the license fees and the adult entertainment license was issued by the City."); id. at ¶ 5.2; Davis Decl. (Dkt. # 18) at 2 & n.1. As a result, there was no question of Plaintiff's standing to raise the issue of the ordinance's validity. Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011) ("To maintain their challenge to the ordinances at issue in this action, Plaintiffs 'must establish constitutional standing with regard to the provisions challenged.' 'Standing, in the constitutional sense, requires that plaintiffs establish (1) a distinct and palpable injury in fact (2) that is fairly traceable to the challenged provision and (3) that would likely . . . be redressed by a favorable decision for the plaintiff.'" (citations and some internal quotation marks omitted)).

It now appears, however, that the Court's assumption may have been incorrect. All the evidence before the Court suggests that Plaintiff never attained an interest in ASF's license. Compare Davis Decl. (Dkt. # 18) at 2 & n.1 (representing that he had formerly done business as ASF but had started Plaintiff for this business), with Def. Exh. # 528 (Plaintiff's Response to Interrogatory # 1) (noting that ASF is still in existence and owns Jiggles). And because standing is jurisdictional, the Court cannot simply rely on the City's failure to bring the issue to the Court's attention or even make note of the fact that Plaintiff never applied for a license. Yakima Valley Mem'l Hosp. v.

MEMORANDUM OF DECISION - 18

Wash. State Dept. of Health, 654 F.3d 919, 932 n.17 (9th Cir. 2011) (noting "that Article III standing is jurisdictional and can neither be waived by the parties nor ignored by the court"). The Court must satisfy itself that there was justification for its ruling.

To remedy this uncertainty, Court directs Plaintiff to file a brief addressing its standing.[18] Specifically, the Court wishes to know if Plaintiff has any factual basis for relying on ASF's license. If not, Plaintiff may also wish to discuss whether it nonetheless had standing to challenge the ordinance's facial validity in the context of its present claim. Plaintiff's brief should not exceed 15 pages and should be filed no later than April 19, 2012. The City shall file a response no later than April 30, 2012. Any reply is due no later than May 4, 2012.

## C. Attorney's Fees

At the close of trial, the Court granted Plaintiff's request to delay ruling on the issue of attorney's fees until the Court had issued the present ruling. This delay is particularly appropriate now, given that the Court has awarded Plaintiff only nominal damages, see Farrar v. Hobby, 506 U.S. 103, 115 (1992) ("When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." (citation omitted)); Mahach-Watkins v. Depee, 593 F.3d 1054, 1059–60 (9th Cir. 2010) (same with exceptions), and has directed the parties to file additional briefing.

Accordingly, the Court directs the parties to also address in their supplemental briefing whether attorney's fees are appropriate, and, if so, how much. At the very least, Plaintiff's brief should address the specific concerns discussed in Farrar and Depee.

## III. CONCLUSION

For all of the foregoing reasons, the Court awards Plaintiff no economic damages

---

[18] The Court would note that Plaintiff's attorney would only be eligible to seek attorney fees under § 1988 for her work on this issue if Plaintiff had standing to raise the issue.

MEMORANDUM OF DECISION - 19

and $1 in nominal damages. The Court further directs the parties to file supplemental briefing on the standing and attorney's fees issues according to the described schedule.

DATED this 27th day of March, 2012.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

MEMORANDUM OF DECISION - 20